Mrs. Erin REIS, Caroline C. Hoelzer, Paul Randall and Leo Lau, Appellants,

v.

The METROPOLITAN ST. LOUIS SEWER DISTRICT, Respondent.

No. 49875.

Supreme Court of Missouri,

Division No. 2.

Dec. 9, 1963.

Charles M. Shaw, Clayton, for appellants.

Thompson, Mitchell, Douglas & Neill, James M. Douglas, David F. Ulmer, W. Stanley Walch, St. Louis, for respondent.

EAGER, Judge.

█ In this action to enjoin all further proceedings in connection with the proposed construction of a storm sewer, the trial court entered a summary judgment for the defendant. See Rule 74, V.A.M.R. The estimated immediate cost of these sewers is $650,000 and defendant has adopted a resolution finding that the improvement is in the public interest and that the work should proceed. Thus, the aggregate of the special assessments upon the class of persons and property which plain-

tiffs represent, and consequently the value of the relief to be granted or denied, will far exceed the sum of $15,000, and we have jurisdiction. Cooper v. School District of Kansas City, 362 Mo. 49, 239 S.W.2d 509. The area involved here is in the extreme southeastern part of St. Louis County in the Lemay neighborhood.

The facts which we relate are taken from an affidavit submitted by defendant and from the depositions of the four plaintiffs. We deal first with the affidavit of John H. Sears, Chief of the Subdistrict Development Department of defendant, to which was attached a copy of The Metropolitan St. Louis Sewer District Plan, as adopted on February 9, 1954. This plan provides: that the Board of Trustees is empowered to create subdistricts and to fix the boundaries thereof, either for sewers or drainage facilities; that no such ordinance shall become effective until three weeks after a public hearing is held, and that notice of such hearing shall be published at least three weeks before such hearing; that the Board may levy, assess and collect taxes on all taxable property within a district or subdistrict, and may fix, levy and collect special benefit assessments levied ratably by area upon such lots or parcels of ground as are benefited; that the Board shall adopt a resolution declaring the necessity of any such improvement; that the Board shall give adequate notice of a public hearing on all improvements to be paid for by special benefit assessments and on all others costing $7,500 or more; that such hearing shall be held not less than ten nor more than thirty days after the adoption of the resolution, and that thereafter the Board may determine that it is or is not in the public interest that such improvement be made.

The affidavit of Mr. Sears states, in substance: that the matters stated are within his personal knowledge; that in May 1955, a petition was received from 34 residents in the area in question requesting action for the correction of flooding conditions; that in 1957 a contract was made by defendant for an engineering study and such a report was received; that further studies of boundaries were made by affiant; that a public hearing was called by defendant for February 29, 1960, on a proposal to create such a subdistrict and that notice thereof was published in the St. Louis Globe-Democrat on February 4, 1960; that such public hearing was held and a report thereof made by affiant to the Board; and that on March 31, 1960, the Board adopted Ordinance No. 383 establishing such a subdistrict as "Subdistrict No. 89 (Loretta-Joplin)" as shown on a map attached to the affidavit; that on June 29, 1961, after another report from affiant, the Board considered the matter further and adopted Resolution No. 422 declaring the necessity of the construction of storm water improvements in that subdistrict, estimating the cost at $1,100,000, providing for payment by special benefit assessments and calling for a public hearing on July 18, 1961; that notice of such hearing was published in the St. Louis Post-Dispatch on July 7, 1961, notices thereof were posted at twelve places in the District on July 6, 1961, and notices were mailed to some of the residents; that such a hearing was held; that thereafter representatives of defendant, including the affiant, met informally on several occasions with some of the property owners to determine whether the proposed special assessments might be reduced; that affiant prepared a revised plan by which the immediate proposed construction would cost $650,000, with the system to be completed later from the proceeds of an annual ad valorem tax levy of from 25 cents to 30 cents per one hundred dollars valuation for a period of not to exceed twenty years; that such plan met with the approval of a majority of the property owners present at an informal meeting; that on October 30, 1961, affiant reported these developments to the Board and that the Board adopted its Resolution No. 467 repealing the prior Resolution (No. 422), redetermining the necessity of "adequate major storm sewers" and esti-

mating the cost at $650,000 to be paid for by special benefit assessments and providing for a public hearing on November 20, 1961; that notice of such hearing was published on November 9, 1961, in the St. Louis Post-Dispatch, notices were posted in seventeen locations in the subdistrict on said day, and written notices were mailed to those persons whose addresses were in defendant's billing records; that such a hearing was held, all persons present were given an opportunity to be heard, and that people present did speak both pro and con; that a report of such hearing was filed and the Board, on December 7, 1961, adopted Resolution No. 474 finding and declaring that such improvement was in the public interest and that such improvements should proceed. On December 19, 1961, the present suit was filed.

Plaintiffs' First Amended Petition (filed as a class action) was filed on January 31, 1962; defendant answered on March 6, 1962. On May 31, 1962, defendant filed its Motion for Summary Judgment pursuant to Rule 74.04 (with Mr. Sears' affidavit attached as an exhibit) on the grounds that: the pleadings, the depositions on file, and the affidavit of Mr. Sears showed that there was "no genuine issue as to any material fact and that defendant is entitled to judgment in its favor as a matter of law." In the meantime, on March 22, 1962, the depositions of the four plaintiffs had been taken by defendant's counsel. On September 15, 1962, the Court sustained defendant's motion and entered judgment for defendant and against all plaintiffs. After the overruling of a motion for rehearing asserting that there remained an issue of fact, plaintiffs filed notice of appeal. Before digesting further facts, we note that the amended petition charged (aside from formal allegations, including the intention to install the sewer) that no hearing of the plan to establish the subdistrict had properly been held, that the proposal was not for the public good or general welfare, that it would work an undue hardship on the property owners, that defendant's acts were oppressive and in excess of its jurisdiction, and that there would be no benefit to the property owners.

In the depositions of the four plaintiffs the following was developed, treating the evidence collectively: that in flash floods from five to seven homes are sometimes flooded, but that most of the water comes down Kingston Street which is a state highway and spills over on to private property; that if the State would provide better drainage on the highway (which, it was claimed, had only a "little" drain) there would be no flooding; that there is occasional flooding at Broadway and Kingston, at Broadway and Ripa, and at Perrin and Arlee; that there have been times when cars and busses could not go through; that the cost of this sewer project would hurt a lot of people who could not afford to pay, such as old age pensioners, etc., and that some would lose everything; that the witnesses did not feel that the community needed the sewer and felt that its cost would be "oppressive"; that no public benefit would be derived from the plan; that there were three meetings and at one (at Notre Dame High School) there were sundry people present who did not live in the district; that one of the officials said at one meeting that "they were going to put them in whether we wanted them or not"; that various persons spoke in opposition to the project at the meetings, and that there were probably three hundred people at the third meeting; that the property owners had formed an organization and that its officers met with the officials; that some of these officers agreed to a revised plan of assessment at the rate of five cents per square foot (instead of the original eight cents) plus an added property assessment, but that many people were still dissatisfied; that the property owners were never asked at the meetings whether they wanted the sewer or not; that the planned diagonal course of the sewer would disrupt the community, and that, as proposed, the sewer is too large; that probably 1,500 people are in the group opposing the sewer.

One plaintiff (Hoelzer) testified that her total cost (assessment and increased ad valorem tax) on each of two 125 x 360 foot lots would be about $3,000 and that the lots cost $9,000 and $9,500, respectively, in 1958 and 1959. It is conceded by defendant that the proposed special assessments will be at the rate of five cents per square foot, plus the added ad valorem tax for the future completion of the project; defendant states in its brief that the largest assessment will be approximately $2,250 on each of the Hoelzer lots (which may readily be calculated), or approximately 25% of the supposed value, plus an anticipated total increase of $180 in the ad valorem taxes on each lot over a twenty-year period. This seems to be partially outside the record, but the precise figures are not, in our view, conclusive or highly material. No showing was made as to whether the storm sewer would add to the values of property in the area.

▪▪ Appellants' brief is ten and one-half pages in length; four pages consist of a quotation of the amended petition, and two pages of quotations from the depositions. The first point made is that the courts have the right to grant relief against the "arbitrary exercise of a discretionary power by the legislative body of a municipality." There can be no doubt about that, as a general proposition of law. The second (and only other) point is that a summary judgment should not be rendered on any "issue triable by a jury or the Court without a jury unless the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law." Under the point only our Rule is cited. This point is really not sufficient to demonstrate "why it is contended the court was wrong," as required by Rule 83.05(e) but, in view of the existence here of a limited public interest, we pass to the merits. Appellants' argument on this point consists of four short paragraphs. In substance, it is that "admitting the affidavit submitted * * * there remains an issue of fact * * *";

that even if all the acts set out in the affidavit were completed the "decision could very well be oppressive * * *," and that "honorable means" do not justify an "oppressive end." The concluding paragraph under this point (after quoting from the depositions of plaintiffs) is: "The appellants submit that assuming all the above testimony as true and duly considering the respondent's affidavit, there remains an issue of fact, and the appellants are therefore, entitled to their day in court and entitled to be heard on the issue of whether or not the proposed act of the respondent amounts to an arbitrary exercise of respondent's power and whether or not their actions are oppressive." We thus gather that counsel's sole claim is that the charges of excessive cost, lack of necessity, hardship, and oppression, as stated by the lay plaintiffs in their depositions, raise a genuine fact issue as to the existence of a supposed arbitrary exercise of power.

Our Rule 74.04 has not often been construed and indeed it seems to have been used relatively little. The Rule provides in part, in 74.04(c) and (h), that "The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. Judgments sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. * * *

"In no case shall a summary judgment be rendered on issue triable by jury or the court without a jury unless the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law."

▪ Since plaintiffs do not present here any deficiencies in the procedural steps and seemingly admit their sufficiency, we shall not concern ourselves with that question. One or more of the plaintiffs stated in the depositions that at one of the

hearings a number of outsiders were present, more or less complicating the proceedings, but we find nothing in this to invalidate the hearing, as such. There was no testimony that the outsiders participated in the meeting. There is, of course, a presumption that ordinances have been validly enacted. Marks v. Bettendorf's, Inc., Mo.App., 337 S.W.2d 585, 590.

Under Rule 74.04(a) the party moving for a summary judgment may file and serve supporting affidavits, as defendant did here; the adverse party may, under 74.-04(c), serve opposing affidavits; these are then considered, along with the pleadings, depositions, and any admissions on file, to determine whether there remains any genuine issue of material fact. The answer here contains no admissions which would affect our question; its admissions are of formal matters and of the fact that defendant has proceeded to establish the sewer subdistrict, and that it proposes to install the storm sewers and to levy special assessments. Plaintiffs filed no opposing affidavits, but prior to the hearing on the motion for judgment defendant had taken and filed the depositions of the four plaintiffs. We may and do consider these as plaintiffs' evidence in opposition to the motion and we assume that the trial court so considered them. The case has been briefed by defendant on that assumption.

In ruling such a motion the court must be convinced, as a matter of law, that there is no genuine issue of fact. The rule so provides. 74.04(c) and (h). And see: Orvis v. Brickman, 90 U.S.App.D.C. 266, 196 F.2d 762; Wilkinson v. Powell (CA 5), 149 F.2d 335; Gifford v. Travelers Protective Ass'n of America (CA 9), 153 F.2d 209. In Wilkinson, supra, the Court said, in part, loc. cit. 149 F.2d 336–337: "In Volume 3, Moore's Federal Practice under the new Federal Rules, page 3174, the learned authors say: 'The summary judgment procedure prescribed in Rule 56 is a procedural device for promptly disposing of actions in which there is no genuine

issue as to any material fact. In many cases there is no genuine issue of fact, although such issue is raised by the formal pleadings. * * * "The very object of a motion for summary judgment is to separate what is formal or pretended in denial or averment from what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial." To attain this end, the rule permits a party to pierce the allegations of fact in the pleadings and to obtain relief by a summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there is no genuine issue of fact to be tried.' * * * upon the trial of appellees' motion, appellant's failure to offer in evidence counter-affidavits or testimony of some kind to off-set the affidavits filed by appellees warranted the court below in finding that no genuine issue of a material fact existed." Also, see, generally, the following Missouri cases: Ieppert v. John Hancock Mutual Life Ins. Co., Mo.App., 347 S.W.2d 436; Jacobson v. Vestal, Mo., 361 S.W.2d 677; Oakley v. Duerbeck Company, Mo., 366 S.W.2d 430; Swink v. Swink, Mo., 367 S.W.2d 575; Gruenewaelder v. Wintermann, Mo., 360 S.W.2d 678. The real, and only, question here is whether the depositions raise any genuine issue of fact.

Many Missouri cases recognize that local legislative bodies, such as municipal councils, sewer district boards, etc., are vested with a broad discretion which, absent an affirmative showing of fraud, oppression or arbitrary action, is not subject to review by the courts. Goodson v. City of Ferguson, Mo.App., 345 S.W.2d 381; Heman v. Schulte, 166 Mo. 409, 66 S.W. 163 [aff. 189 U.S. 507, 23 S.Ct. 852, 44 L.Ed. 922]; Giers Implement Corp. v. Investment Service, Mo., 235 S.W.2d 355; Granite Bituminous Paving Co. v. Fleming, 251 Mo. 210, 158 S.W. 4; Lansdown v. Kierns, 303 Mo. 75, 260 S.W. 88; City of Washington ex rel. Luth v. Stumpe, Mo.App., 83 S.W.2d 111; Standard Investment Co. v. Stephensmeier, Mo.App., 117

S.W.2d 620; McMurry v. Kansas City, 283 Mo. 479, 223 S.W. 615; City of Webster Groves v. Taylor, 321 Mo. 955, 13 S.W.2d 646. This discretion extends to a determination of the benefits to be derived from the project (Giers, Webster Groves and Heman, supra), the expediency of the project (Lansdown, supra), and the public necessity and wisdom of the improvement (Goodson, supra). For instance, in Taylor, supra, at 13 S.W.2d, loc. cit. 647, the Court said: "It is equally well settled that whether in a given case property so burdened has received corresponding benefits is a legislative, and not a judicial, question, and that the legislative determination that such benefits are conferred is conclusive on both the owner and the courts, unless it be made to appear that the legislative action is fraudulent, or is 'arbitrary and wholly unwarranted,' 'a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property.'"

When we boil down the testimony of the four plaintiffs, as given in their depositions, we find that (though expressed in different ways) it is: that there is comparatively little flooding in the subdistrict, and that this comes mostly from water running off the highway; that the cost of the proposed project is excessive, that it will work an extreme hardship on many people, and that the sewer is too large; that the community has no real need for the sewer; that the project and the acts of defendant are "oppressive" because of the cost and the assessments to be levied; that most of the residents will not benefit from the plan; also, that there was some irregularity in one or more meetings in that outsiders attended and that a representative of defendant said that "they were going to put the sewers in whether we wanted them or not." When we examine this testimony in the light of the demonstrated facts, we find that all or nearly all of the assertions are conclusions, as distinguished from facts which would raise any genuine issue. The necessity for the project, the boundaries of the subdistrict,

the existence and extent of benefits, the cost, and the mode of taxation are all matters which are entrusted to the defendant for its decision; there are no *facts* stated which would sustain plaintiffs' burden of overturning the decision as a fraudulent or arbitrary action. The so-called claim of "oppression" was tied to the allegedly excessive cost of the project and the hardships expected. Defendant had the benefit of engineering surveys; plaintiffs are lay people, well intentioned it is true, but not really conversant with technical matters such as sewer construction. The situation is somewhat analogous to that in Granite Bituminous Paving Co. v. Fleming, 251 Mo. 210, 158 S.W. 4, where the defendant in a tax bill suit alleged that the improvement was of no benefit to him or of no greater benefit than to any other property owner in St. Louis; those allegations were stricken, defendant refused to plead further and judgment followed. The Court said in part, loc. cit. 158 S.W. 7: "When a pleader asserts that certain admitted facts produce a result which the court from its own judicial knowledge knows is not the result or probable result of such admitted facts, are such conclusions of the pleader presumed to be true? We think not. A demurrer admits facts well pleaded, but in the very nature of things it does not admit the truth of conclusions, conjectures, or mere matters in the nature of prophecy or prediction asserted by the pleader arguendo. Donovan v. Boeck, 217 Mo. 70, 116 S. W. 543; Meek v. Hurst, 223 Mo. 688, 122 S.W. 1022, 135 Am.St.Rep. 531; 31 Cyc. p. 333." In view of our oft-announced principles which fix a broad discretion in defendant as to these very matters of cost, benefits and necessity, we cannot hold that the generalizations of the plaintiffs created a genuine issue of fact.

We have already noted that the claim of a supposed irregularity in one or more meetings, which claim is abandoned here, creates no material issue. The testimony concerning hardship and inability to pay the proposed assessments stands in a

somewhat different light from the generalizations just discussed. We shall assume that they constitute statements of fact; but even so, our cases indicate that such a fact, if true, is insufficient to make the acts of defendant arbitrary or oppressive. In Heman v. Schulte, 166 Mo. 409, 66 S.W. 163 (cited supra), the Court said in part, at 66 S.W., loc. cit. 166: "Not only is it the rule in this state, as asserted above, 'that, when the matter of establishing sewer districts is intrusted by the legislature to the common council, its action in the premises is conclusive in a collateral attack,' but the rule generally stated is that, where a municipal body vested with the exercise of a power acts, its acts under that power, in the absence of fraud, are conclusive upon the courts, whether the attack made thereon is collateral or direct, and the fraud that will authorize the court's interference in the matter of municipal action is not that the power exercised or the ordinance passed has resulted in an individual hardship in its execution, or that in the working out of the general scheme designed by an ordinance an individual burden is imposed, without a corresponding benefit conferred (a necessary incident to any system of general taxation or special assessment yet devised for governmental maintenance and support), but only in those cases when the acts of the municipal body are so unreasonable, oppressive, and subversive of the rights of the citizen in the general purpose declared as to clearly indicate and leave but one inference,—that of an attempted abuse, rather than the legitimate use, of a power enjoyed; and of this qualified and limited assertion of right in the courts to interfere with municipal legislation much doubt is felt." If a local legislative body, such as defendant, were required to ascertain in advance whether all those persons to be assessed could reasonably pay their assessments, we would have no improvements of this type. We find no cases invalidating an ordinance such as this on account of individual hardship. This question must be viewed in connection with the cases already cited to the effect that the decision of the Board concerning benefits is ordinarily conclusive. In Nichols v. Kansas City, 291 Mo. 690, 237 S.W. 107, the plaintiff sued in equity to cancel certain tax bills for grading, which totaled $2,323.45 on property shown to be worth $3,549, after the improvement. A dismissal of the petition was affirmed. The court held that the question of benefits and the assessment on any individual property or lot were legislative questions not subject to review. See, generally: Mudd v. Wehmeyer, 323 Mo. 704, 19 S.W.2d 891; City of Springfield v. Wright, Mo.App., 282 S.W. 751. Those cases deal with the assessments on individual lots rather than with an attack upon the entire project, but we have held here that there have been no *facts* produced to show that the plan is arbitrary. It may readily be calculated from the record that the special assessments on two lots of Mrs. Hoelzer (which cost $9,000 and $9,500, respectively) would supposedly be $2,250 each; it is stated by defendant that on each of these lots there will be an anticipated total increase of some $180 in future ad valorem taxes. (The valuations for tax purposes have been stated outside the record, but we may assume an approximate 30% assessment, and a 25% additional levy; the precise figures are immaterial.) Apparently all other assessments are proportionately less, although none are shown. We are unable to justify an invalidation of this proposal because of Hoelzer's anticipated assessments; they certainly do not, per se, demonstrate fraud or an arbitrary abuse of power.

We sympathize with the residents of this area upon whom this project may work individual hardships, and there are undoubtedly such persons. If, however, we are to maintain the integrity of our traditional system of local governments and delegated powers, the courts must refrain from interfering with the acts of these bodies except where a real and arbitrary abuse of discretion appears. We find no *facts* here, as distinguished from conclusions, which

raise a genuine issue on that score, and the proof of defendant is therefore "unassailable." Rule 74.04(h).

The judgment is affirmed.

All of the Judges concur.