421 P.2d 747

**Werner Edward RANTA, Plaintiff-Appellant,**

**v.**

**Clarence C. RAKE and Janet F. Rake, his wife, and Charles Rake, a minor, Defendants-Respondents.**

**No. 9796.**

Supreme Court of Idaho.

Dec. 21, 1966.

Rehearing Denied Jan. 16, 1967.

Rapaich & Knutson, Lewiston, for appellant.

Clements & Clements, Lewiston, for respondents.

SPEAR, Justice.

This appeal presents the issue whether an honest release, irrespective of its terms, may be avoided where it later appears that unknown injuries existed at the time it was executed.

On April 8, 1962, appellant (Werner Edward Ranta) sustained injuries in an automobile accident for which he seeks damages against Charles Rake, a minor, the driver of the other car, and his parents, Charles C. and Janet F. Rake. The accident occurred at an intersection in the Lewiston Orchards, near the City of Lewiston, Nez Perce County, Idaho. Both Ranta and his wife, Eva Jean Ranta, were, as a result of the accident, taken to the hospital in Lewiston for treatment. Mrs. Ranta sustained a cut on her right knee and was otherwise bruised and shaken up. The record discloses that when appellant was admitted to the emergency room at the hospital he was suffering from a contusion of the left eye, a laceration of the left check, a laceration under the left arm and a back injury. The injuries however seemingly were only minor in nature and within a few days following the accident Ranta returned to work.

Dr. John E. Carssow, the Ranta family physician for more than fifteen years, treated appellant at the hospital and for a month following the accident at his office in Lewiston. The doctor X-rayed and otherwise treated the back injury which appellant had sustained but was unable to diagnose the injury as anything more serious than a lumbar strain or pulled muscle.

Charles P. Burch, an independent adjuster representing respondents' insurance carrier, visited the Ranta home within two or three days after the accident and secured from each a written statement which detailed the facts of the collision as known by them and the nature of the injuries each had sustained. There was no discussion of a settlement at this time. The parties intended to ascertain the full extent of the injuries sustained by appellant and his wife before attempting to settle. Subsequently appellant told his physician that he had been contacted by an insurance adjuster and that he was going to sign a release based on the results of the doctor's diagnosis. Dr. Carssow told appellant it was his opinion that appellant would "probably get better" and that he expected him to "get better." Appellant, in fact, continued to show improvement.

One month after the accident, on May 8, 1962, appellant and Mrs. Ranta, at their request, again met with Mr. Burch at their home. They now agreed to settle and compromise, for $1,114.50, any claim they had against Charles Rake, or his parents as owners of the car their son was driving, arising out of the accident. The couple executed a general release, and the consideration set forth in the release subsequently was paid to them, and a receipt therefor given by them. The payment of $1,114.50 was apportioned to appellant's car damage in the amount of $285.00, to Mrs. Ranta's general and special damages of $223.00, and the balance to appellant's general and special damages. The figures used to arrive at the amount of the settlement were submitted by appellant and his wife and were agreed to as such by Charles Burch, the adjuster. The release, a form instrument, is broadly worded and is a release for all known and unknown injuries which may have resulted from the accident of April 8th. Its terms are as follows:

"RELEASE OF ALL CLAIMS
"KNOWN ALL MEN BY THESE PRESENTS:

"That the undersigned, being of lawful age, for the sole consideration of *ONE THOUSAND ONE HUNDRED FOURTEEN AND 50/100* ............ DOLLARS ($1,114.50) to the undersigned in hand paid, receipt whereof is hereby acknowledged, do/does hereby and for my/our/its heirs, executors, administrators, successors and assigns release, acquit and forever discharge *Charles E. Rake and Clarence Rake* and his, her, their, or its agents, servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever, which the undersigned now has/have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 8th day of *April, 1962,* at or near *Lewiston, Idaho.*

"It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that said releasees deny liability therefor and intend merely to avoid litigation and buy their peace.

"The undersigned hereby declare(s) and represent(s) that the injuries sustained are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite and in making this Release it is understood and agreed, that the undersigned rely(ies) wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, affect and duration of said injuries and liability therefor and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.

"The undersigned further declare(s) and represent(s) that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

"THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

"Signed, sealed and delivered this *8th* day of *May, 1962.*

CAUTION: READ BEFORE SIGNING BELOW"

Appellant had been in constant touch with his physician prior to the execution of the release and had been informed the

injuries which he had received were relatively minor. However, on June 15th, more than a month following the execution of the release, appellant experienced severe pain in the area of his left hip, which radiated down his left leg. He secured treatment from two doctors in Lewiston, and one in Spokane, Washington. Dr. Colburn concluded appellant was suffering from an intervertebral herniated disc, which he removed by surgery on September 2, 1962. It was Dr. Colburn's opinion that the immediate and initiating cause of the herniated disc was the car accident of April 8th. Appellant had experienced low back pain and trouble while in high school particularly in the year 1948 or 1949 and had some disc pathology prior to April 8, 1962, but Dr. Colburn concluded the accident of that day aggravated or triggered the pain which appellant experienced on or about June 15th, and which resulted in the subsequent surgical procedure.

On December 19, 1963, appellant filed an action against respondents, in which he alleged that the respondent Charles Rake was negligent in operating the automobile owned by his parents and that such negligence was the proximate cause of the accident of April 8, 1962, which resulted in the injuries he sustained. Respondents entered the affirmative defense that appellant had executed a general release which barred further recovery and precluded the action against respondents. The matter, in accord with the stipulation of the parties, was tried on the sole issue of respondents' affirmative defense. The trial court specifically found that the appellant intended in executing the release to effect a complete release as to any condition in his back which existed at or prior to the execution of the release and as to any subsequent development of that condition. The court further found that appellant had released respondents from any and all causes of action he had against them on or prior to May 8, 1962, or any subsequent development known or unknown, anticipated or unanticipated. From these findings the trial court concluded that at the time of the

release, appellant understood the entire terms, covenants and conditions of the release, and that any mistake as to appellant's condition or health was a unilateral mistake and not a mutual mistake as between appellant and his releasees. The court further concluded that the release was binding and valid and afforded respondents a complete defense to the action. Judgment was entered thereupon for the respondents dismissing the action with prejudice. From this judgment this appeal was taken.

The judgment must be reversed.

There is an irreconcilable split of authority on this question in the opinions of sister states which have had the occasion to rule thereon. The minority view is aptly expressed in Wheeler v. White Rock Bottling Co. of Oregon, 229 Or. 360, 366 P.2d 527 (1961). After recognizing the existence of the majority rule and the reasons ordinarily given to substantiate it, the Oregon court rejected the rule and, in part, stated:

"Heretofore this court has considered the settlement of claims prior to litigation to be in the public interest. In the redress of wrongs between motorists, we follow adversary procedure in court when settlement is not otherwise made. There is no reason in principle why an improvident settlement made before trial is any more to be set aside than a judgment rendered upon a verdict that hindsight later proves to have been obtained too soon and for too little. No one has suggested that judgments in personal injury cases should be kept open like claims under the Workmen's Compensation Act for additional awards in the event of aggravation (ORS 656.276).

"As noted, there are attractive policy reasons for adopting a rule that would permit perfectly honorable releases to be repudiated in the event of aggravation of an injury or the discovery of undiagnosed injuries. There are less compassionate but equally sound policy reasons for requiring persons of legal age and capacity to contract to stand by their

covenants, including bargains containing an element of chance. * * *

"Accordingly, while we are mindful of the trend elsewhere toward treating releases as binding only when they do not result in hardship, we believe that our own decisions and previous choices of competing policy considerations require us to reject mere improvidence as a plausible ground for setting aside otherwise unimpeachable contracts."

It will be noted there was a strong dissent to this opinion.

The majority and the more modern view, while recognizing the policy of encouraging out-of-court settlements of personal injury claims, permits a releasor to avoid a release where unknown injuries existed at the time the release was executed though the release invariably is broad enough to encompass unforeseen injuries and though the release was honestly obtained without fraud, over-reaching or undue influence on the part of the releasee. Some courts have recognized that cases of this type are to some degree sui generis and substantially abandon any attempt to fit these situations within the classic limitations of the law of fraud or mistake and have held that the release may be set aside upon a showing of an inequitable result unless it is established that it was "fairly and knowingly made." Casey v. Proctor, 59 Cal.2d 97, 28 Cal.Rptr. 307, 378 P.2d 579 (1963); Denton v. Utley, 350 Mich. 332, 86 N.W.2d 537 (1957); Clancy v. Pacenti, 15 Ill.App.2d 171, 145 N.E.2d 802, 71 A.L.R.2d 77 (1957); Smith v. Broscheid, 46 Ill.App.2d 117, 196 N.E.2d 380 (1964); Goodman v. Missouri Pacific Railroad Co., 312 S.W.2d 42 (Mo.1958); 6 Corbin on Contracts, § 1292, pp. 181–183 (1962); and 5 Williston, Contracts, § 1551, pp. 4347–4349 (rev. ed. 1937). For an exhaustive coverage of this question see 71 A.L.R.2d 82.

The courts following this policy of avoiding releases where improvidently made are guided by the following factors: (a) the peculiar dignity the law accords the human person, as distinguished from articles of commerce; (b) the very real possibility of being mistaken about the long range effects of damage to human tissue; (c) the inequality of the bargaining positions of the contracting parties; and (d) the amount of consideration received compared to the risk of the existence of unknown injuries. The rationale is most aptly expressed by the Illinois court in Clancy v. Pacenti, supra, as follows:

"We have not taken into account cases other than those involving personal injuries because personal injury cases in this respect are sui generis. Ricketts v. Pennsylvania R. Co., 2 Cir, 153 F.2d 757, at page 767, 164 A.L.R. 387. However no rationale has been formulated for the special treatment of such cases. It appears to rest on the peculiar character of personal injuries. In such cases it is not an article of commerce that is involved, but the human mind and body, still the most complicated and mysterious of all the things that are upon or inhabit the earth. Here, mistakes are easily made and the consequences are more serious than in any other of the affairs of man. A slight abrasion may mean nothing or it may lead to a malignacy. Insignificant pain may mean the beginning of a fatal coronary attack or only a slight intestinal disturbance. Yet, a man cannot and does not live in dread of these possibilities. He accepts assurances that all will be well, even though ultimate consequences cannot be appraised as in matters involving property or services. In Ricketts v. Pennsylvania R. Co., supra, 153 F.2d at page 767, Judge Frank, in a specially concurring opinion says:

" 'In all likelihood, it is because the courts have sensed the differentiated character of releases of personal injury claims that the "modern trend" as Wigmore describes it, "is to * * * develop a special doctrine * * * for that class of cases, liberally relieving the party who signed the release." Wigmore, Evidence, § 2416.'

"The sharp economic inequality of the bargaining parties which generally exists in this class of cases has also been considered by the courts in their consideration of this doctrine. It is by no means as modern an innovation as to some may appear. Long before personal injury cases began to absorb the common law courts, the rule was applied to seamen in admiralty cases. (See opinion of Judge Frank, supra, quotation from Mr. Justice Story.) That related to contracts between seamen and their employers, but no one can doubt that it has a considerable bearing upon situations such as are here presented.

"The foregoing are the principal reasons which have impelled courts to take a broad view in affording relief for a release executed on a mistaken understanding of the nature and extent of personal injuries. Yet it is important to preserve a field of free action within which parties may compromise their differences with substantial assurance that the matter will not arise again. We therefore summarize the aspects of the instant case which bring it within any reasonable rule to be deduced from the cases cited. The release was given for a nominal sum, $150, $100 of which was for damages to plaintiff's car. Both parties understood plaintiff's injuries to be of little or no consequence when, as a matter of fact, they were of a character different, both as to nature and extent, from the diagnosis. If plaintiff had known that as a result of the accident she had two herniated discs and had settled on the assumption that the consequences would not be as severe as those which followed, a different case would have been presented to us. The mistake was clearly proved." 145 N.E.2d at 805.

For a complete summary of the rule as applied in Illinois, see Reede v. Treat, 62 Ill.App.2d 120, 210 N.E.2d 833 (1965), a late case which approves the theory adopted in Clancy v. Pacenti, supra.

The same factors are present in the case at hand and require setting aside the release executed by the appellant.

Additionally it will be noted, this court has previously recognized this general principle requiring setting aside of a release when the true facts were unknown to the parties at the time the release was executed. In Heath v. Utah Home Fire Ins. Co., 89 Idaho 490, 406 P.2d 341, although the court there was concerned with a release involving damages to real property by hail, nevertheless the court relied upon, and extensively quoted from, Casey v. Proctor, supra, the California case which involved personal injuries of almost the exact nature suffered by appellant in the case at hand. This court also cited Sloan v. Standard Oil Co., 177 Ohio St. 149, 203 N.E.2d 237 (1964).

See also I.C. § 29–113 [1], which we find is indicative of recognition by the Idaho legislature, that releases of claims for personal injuries involve special policy considerations.

For another case which applies the majority rule to facts strikingly similar to those in the case before the court, see Goodman v. Missouri Pacific Railroad Co., 312 S.W.2d 42 (Mo.1958).

█ It is conceded that the releasor has the burden of proving the reasons for setting aside the release by clear, satisfactory and convincing evidence, Estes v. Magee, 62 Idaho 82, 109 P.2d 631, but the record shows appellant adequately sustained that burden of proof in the proceedings before the trial court.

[1]. "29–113. Release for personal injury.— Any agreement entered into by any person within fifteen days after he incurs a personal injury, which may adversely affect his right to be compensated for such injury, may be disavowed by such injured person within one year after the making of the agreement. No agreement disavowed may be introduced as evidence in any subsequent court or administrative proceeding."

382

■ The finding of the trial court that appellant intended in executing the release to effect a complete release as to the condition in his back which then existed and as to any subsequent development in that condition, is, we feel, supported only by the wording of the release in evidence. This is not conclusive. To the contrary, the record presents convincing evidence that appellant did not intend to release a claim for the herniated disc, the existence of which was completely unknown at the time the release was executed.

■ We are of the opinion the majority rule referred to herein is the better rule and applied to the facts at hand, as in the Illinois and Missouri courts in Clancy v. Pacenti, supra, and Goodman v. Missouri Pacific Railroad Co., supra, respectively, requires avoiding any release signed on the basis that the injured party had suffered only a pulled muscle or muscle strain in the back where in fact the releasor had sustained a much more serious disc injury unknown to the releasor at the time of the execution of the release. We do not fear, as did the court in Reinhardt v. Wilbur, 30 N.J.Super. 502, 105 A.2d 415 (1954), that this decision will open the floodgates to recurrent challenges in the courts of releases honestly secured. Our decision does no more than provide just relief in those relatively few cases where it would be inequitable to hold the release a bar to later action or renewed negotiation because the injuries sustained prove more serious than could reasonably have been foreseen by any of the parties at the time the release was executed. This leaves free that much larger area and more frequent situation where out-of-court settlement is satisfactorily and equitably achieved.

The basis for this conclusion is found in the particular facts of this case and in the nature of the peculiar injury involved. The record shows appellant was in constant contact with and secured the advice of his family physician before agreeing to settle with respondents. Having been advised the back injury was relatively minor

and would improve, appellant went ahead and executed a release of claim for personal injury on the basis of the professional information available to him. The consideration or compensation received was not consistent with an awareness that the injury was or might become as serious as in fact it did, and was a trifling amount compared to the medical cost and other monetary loss which appellant subsequently incurred. By his complaint appellant states that medical expense alone by December 1963 amounted to $1,250.89; that he will incur future medical, hospital and drug expenses in an approximate sum of $5000; that he sustained a wage loss of $3000; and that, as a result of the injury sustained he suffered the loss of enjoyment of those recreational activities that he formerly enjoyed, entitling him to an additional $25,000 damages.

Judgment reversed, with costs to appellant, and the action remanded to the trial court for further proceedings.

McQUADE and TAYLOR, JJ., concur.

McFADDEN, Chief Justice (dissenting, with whom SMITH, J., concurs).

In addition to the factual statement contained in the foregoing opinion certain other facts should be mentioned.

Appellant at the time of execution of the general release by himself and his wife had discussed with his doctor the nature of the injuries he suffered, including his back injuries. He had also discussed with his doctor the execution of the release in question. He stated: "I would have told him [his physician] that when we were healed, when we were released by him that he would sign the release." His doctor testified that whenever there is a back injury, one always thinks about disc involvement, although in this particular case he made another diagnosis. The doctor also testified that he discussed the question of settlement on more than one occasion with appellant, and was aware that appellant was about to sign a release.

A few days following the accident, appellant discussed the question of liability with Mr. Burch, the insurance company adjuster. Appellant testified: "Well, the discussion at that time were the question of liability in this; it was highly doubtful as to who did actually—was liable for this—for the accident, and that the company was willing to settle, and I would be well to accept this settlement as it was because of the question of liability in this case." Even though that discussion was shortly after the accident, the final release was not executed until almost a month after the discussion, and a month following the accident. It is of further interest to note that appellant contends that there was another release signed before the final release was exccuted, although the insurance company adjuster disputes this.

The record reflects that appellant previously had back trouble, even during his high school days.

Mr. Burch, the adjuster, testified that at the time the release was executed, he had concluded that the case should be settled if it could be accomplished on a reasonable basis, and that such conclusion was based on the possible liability of his insured. Mr. Burch testified that on the day the release was executed and before appellant and his wife signed it, Mr. Burch and appellant and his wife discussed the effect of execution of the release. He stated: "Well, yes, the effect of the release was discussed, and I pointed out to both Mr. and Mrs. Ranta that no matter what developed, once we had agreed upon a settlement figure and the release was signed and they had accepted payment, that that concluded the matter, no matter what might develop."

Appellant makes no contention that this release was executed by reason of any misrepresentation or duress on the part of Mr. Burch. Appellant testified that he read the release fully, and that there was nothing he didn't understand contained on the printed page, and that he fully understood it. Appellant testified:

"A. That is kind of hard to answer. I am inexperienced in accidents. I have no occasion to have any experience in them, as to the question of liability, my wife and I, neither of us felt that we wanted to have an argument over the question of liability, and when Mr. Burch informed us that the liability was questionable, we both felt that since we were all right and no further known injuries that we should sign the release under these circumstances.

"Q. But Mr. Burch didn't do anything or say anything that compelled you to sign the release at that time?

"A. No, sir, I won't say that—(Pause)

"Q. Now, the release here, that is Defendant's Exhibit A, does set forth that this releases all known and unknown injuries or any results of any known or unknown injuries. You read that at the time?

"A. Yes, sir, I did.

"Q. You knew that if there was anything wrong with you, it was to be covered in this release?

"A. That is correct.

"Q. The one thing that Mr. Burch told you in advance of your signing was that he would discuss this settlement only when you were satisfied as to the nature and extent of your injuries, is that right?

"A. That's right."

Among other things the trial court found:

"That plaintiff intended in executing the release (Exhibit A) to effect a complete release as to any condition of ill being in his back or any other part of his body existing at or prior to the date of the execution of the release or any subsequent development of any condition of ill being."

Based on such finding, the trial court concluded:

"That at the time of the execution of the release, the plaintiff understood the entire terms, covenants and conditions of the release and any mistake as to plaintiff's condition or health was a unilateral mistake and was not a mutual mistake, as between plaintiff and his releasees."

That finding, in my opinion was based on substantial evidence then before the trial court.

Even in the cases relied upon by appellant in urging reversal of the trial court it is recognized that the intent of the releasor in executing the release governs as to whether the release was one encompassing the future development of known injuries or if the releasor contemplated releasing all injuries, known or unknown. In Denton v. Utley, 350 Mich. 332, 86 N.W.2d 537 (1957), it is stated:

"* * *

"We would not be understood as holding (and here is exactly where many difficulties arise) that it is not within one's competence to say 'I may have serious injuries I know nothing about. As to them I will take my chances.' This, one may do. He may, if he wishes, release his rights and assume the risk of future disablement for $1 'and other good and valuable consideration,' or $50, or indeed, an old beaver hat. In other words, it is possible that a reasonable, intelligent person, in full possession of all his faculties, and with knowledge that he may have serious injuries, will release a tort-feasor from all liability in return for a trifling sum of money. If such has in truth been the intention and the agreement we will not disturb the parties. Cf. Noble v. Farris, 1 Cir., 221 F.2d 950. But although the judges, as Holmes put it, are 'apt to be naif, simple-minded men' (Holmes, Collected Legal Papers, 1920, 295), we will not be foreclosed in our inquiry by any form of release used. We will, in each case where fraud or mistake is alleged, look to the intent of the parties. (This is the orthodox phrasing. Actually as the law of constructive conditions so well illustrates, those who link themselves together by contract assume a certain status with regard to each other, a status with respect to which the law itself imposes certain obligations.) As Williston puts it (Contracts, Rev. ed., § 1551) *'where a release is given by one injured in an accident and more serious injuries develop than were supposed to exist at the time of the settlement, it is a question of fact whether the parties assumed as a basis the release of the known injuries, or whether the intent was to make a compromise for whatever injuries from the accident might exist whether known or not.'*" (Emphasis added.) 86 N.W.2d 542.

In discussing the case of Denton v. Utley, supra, in 1964 in the case of Ryan v. Alexy, 373 Mich. 50, 127 N.W.2d 845 (1964), in a minority opinion it is stated:

"Did plaintiff say in legal effect: I have injuries the nature and extent of which I do not know with certainty, but as to them I will take my chances for the consideration you offer, in view of all the circumstances surrounding my injury including your (defendant's) liability therefor, if any?

"Per contra, did defendant say, in legal effect: I am not liable legally for any of your injury or damages, whatever they may be, known or not, but I will buy my peace and bar future action against me for this consideration?

"Under Denton, supra, such an agreement could be legally made, and so made could become legally binding.

"We cannot, nor do we believe, could the able chancellor determine this essential question of fact unless and until the degree to which the question of the extent of the legal liability of the party paying was in the minds of both parties at the time of the execution of the release. This we believe was the reason the Appellate Court of Illinois, in the cited case of

Thomas v. Hollowell, 20 Ill.App.2d 288, 291, 155 N.E.2d 827, 829, was moved to say under a somewhat similar set of facts:

" 'It has always been the policy of the law to favor compromise and settlement, and it is especially important to sustain that principle in this age of voluminous litigation, particularly in traffic cases. It must be remembered that the question of liability, besides the extent of the injuries, may well be in the minds of the parties.' " 127 N.W.2d 848.

Clancy v. Pacenti, 15 Ill.App.2d 171, 145 N.E.2d 802, 71 A.L.R.2d 77 (Ill.1957), decided by the Illinois Appellate Court, First District, First Div., was resolved on the basis of a factual determination by the lower court. In the case of Thomas v. Hollowell, 20 Ill.App.2d 288, 155 N.E.2d 827 (1959), the same Illinois Appellate Court, First District, First Div., stated, regarding Clancy v. Pacenti:

"In the Clancy case, supra [15 Ill.App. 2d 171, 145 N.E.2d 805], the plaintiff had been examined by his own physician, and also by one representing the defendant, both advised the injuries were in the nature of bruises, neither serious nor permanent. It was later discovered that there were severe injuries to the spine, requiring more than one surgical operation, and with permanent detriment. This is the type of case commonly regarded as a mutual mistake, although the opinion does cite a text writer on the question of unilateral mistake. The opinion also states: 'It is important to preserve a field of free action within which parties may compromise their differences with substantial assurance that the matter will not arise again.' " 155 N.E.2d 828.

Continuing, the court stated:

"It is our conclusion that the attempt to avoid the release on the facts in this case, must be discouraged as a matter of necessary public policy. Accordingly, this court holds that the mere lack of knowledge of some condition on the part of releasor, is not sufficient to avoid the bar of a release which expressly applies to unknown conditions, in the absence of mutual mistake, fraud or overreaching. The trial court ruled correctly and the judgment is affirmed." 155 N.E.2d 829.

In Casey v. Proctor, 59 Cal.2d 97, 28 Cal.Rptr. 307, 378 P.2d 579 (1963), the California supreme court reversed a judgment on a directed verdict in favor of the defendant-releasee and held that the issue was for the jury as to whether the releasor, who received no compensation for personal injuries and with whom the liability insurer conducted no negotiations leading to settlement, consciously discharged his claim for unknown injuries at the time of executing the release while unaware of existence of any personal injuries. In the opinion, the supreme court of California stated:

"Under the majority rule, however, a release may not ipso facto be avoided upon the ground of later discovered injuries. The essence of the rule is that the wording of the release is not conclusive; it is a question of fact whether the parties to the release actually intended to discharge such liability. * * * Whether a release bars an action for later discovered personal injuries is a question of fact and depends upon whether it was 'knowingly' made. (Citations)" 378 P.2d 588.

In Goodman v. Missouri Pacific Railroad Co., 312 S.W.2d 42 (Mo.1958), the court affirmed a judgment entered in favor of a railroad employee for injuries he had sustained. The defense was interposed that the employee had executed a complete release. The supreme court held that the question whether there was a mutual mistake of fact as to permanency of injury when the employee signed the release and settlement was for the jury. Therein the court discussed instructions submitted and held that it was not necessary that the mutual mistake of fact be the sole inducing cause for the execution of the release. The court mentioned the consideration for this release was only $15.00, which was the equivalent of the day's pay when the plain-

tiff was off work. The same court in the case of Oakley v. Duerbeck Company, 366 S.W.2d 430 (Mo.1963), affirmed the holding of the lower court which held an executed · release barred the plaintiff's recovery. Therein a tenant claimed damages against his landlord for injuries sustained in a fall down some stairs. A defense was interposed on the basis of an executed release. Therein the court stated:

"Plaintiff's evidence was that both he and Hickey knew that plaintiff had a fractured back. What plaintiff and Hickey did not know, and apparently plaintiff's doctor did not know was whether plaintiff would fully recover from the injury he sustained. Was that mistake of fact such as authorizes the setting aside of a contract, in this case, the release? We find that under the law it is not. Jennings v. Metropolitan Life Ins. Co., Mo. App., 166 S.W.2d 339, is a case in point. We quote what was there said since it is appropriate to the facts now before us, l. c. 344 (2–5): 'We recognize the rule, invoked by plaintiff, that a mutual mistake as to the existence of a fact which goes to the essence of a contract will render the contract voidable where it later appears that such fact did not exist. But a mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake becomes evident through the passage of time. What is today only a conjecture, an opinion, or a guess, might by tomorrow, through the exercise of hindsight, be regarded then as an absolute fact.' See also 17 C.J.S. Contracts § 144, p. *497* [897]." 366 S.W.2d 433.

In the Oakley case the court distinguished the Goodman case, supra, on the basis of the fact that no one knew of the plaintiff's injury.

Various text writers have discussed the legal issues involved. Corbin on Contracts (1962) discussing the matter of settlements and releases, states:

"If a claim is made for damages for an injury, a compromise settlement is ordinarily not made voidable for mistake because the injury was greater and lasted longer than was expected at the time of the settlement, if the parties knew or had reason to know that the extent of the injury was uncertain and that was the very reason for the compromise. But if the settlement was made in contemplation of one kind of injury, minor in character such as a flesh bruise, when in fact but unknown to the parties, there was a very different injury such as a broken back, the settlement or release may be voidable for mistake. The difference in the one case is a difference in degree; in the next case it is a difference in kind. But a great difference in degree may well be more important than a difference in kind." 6 Corbin on Contracts, 181 § 1292.

Williston on Contracts (1937) in regard to the question of mistake inherent in the execution of a release, and the effect of mistake, states:

"A release though general in terms will be reformed so as to cover merely the right with regard to which the parties were dealing and exclude rights of which they were ignorant. This principle has sometimes been extended so as to exclude from the operation of a release unknown or unexpected consequences of a known right to which the release applied and was intended to apply. *Thus, where a release is given by one injured in an accident and more serious injuries develop than were supposed to exist at the time of the settlement, it is a question of fact whether the parties assumed as a basis of the release the known injuries or whether the intent was to make a compromise for whatever injuries from the accident might exist whether known or not.*" 5 Williston on Contracts (Rev. ed.), 4347 § 155. (Emphasis added.)

See also: 9 Wigmore on Evidence (3rd ed.), p. 55, § 2416. 76 C.J.S. Release § 25, p. 645; 45 Am.Jur., Release, §§ 19, 20, pp. 684–686.

This court in the case of Heath v. Utah Home Fire Insurance Company, 89 Idaho 490, 406 P.2d 341, held that the evidence supported a finding by the trial court of mutual mistake as to a release given by the plaintiff in connection with damage to roof of his building, where damage to the interior of the building was not known or contemplated by the parties at the time of execution of the release. Therein the finding by the trial court recited:

"Plaintiffs executed a release for payments for the exterior damage, but at the time the release was given a substantial injury existed which was unknown to both parties and *not within the contemplation of the parties.*" (Emphasis added.)

Therein, the trial court concluded:

"The release was given under a mutual mistake of a material fact, and the release is therefore avoided and set aside."

This court, after reviewing the record, determined that the record sustained the finding of fact and upheld the judgment. In that case this court considered the earlier decision of this court in Parish v. Page, 50 Idaho 87, 293 P. 979, as well as the case of Estes v. Magee, 62 Idaho 82, 109 P. 2d 631.

In the Heath case, it is to be pointed out that the consideration paid by the insurance company to the releasor was in settlement of the claim for damages recognized, i. e., in accordance with the requirements of the policy of insurance maintained by the releasor with the defendant insurance company.

Appellant contends that Estes v. Magee, supra, is authority to reverse the trial court's determination in the instant case. However, in Estes v. Magee, the release which was set aside was obtained for the benefit of the doctor defendant-releasee, who examined the releasor-plaintiff. This court in Estes v. Magee recognized that in part the intent of the releasor at the time of execution of the release presented a factual issue, and affirmed the determination by the trial court. Therein this court states:

"The case thus hinges on a question of fact as to whether respondent was mislead to his disadvantage at the time he signed the release by positive statements of appellant or the withholding of information peculiarly within appellant's knowledge. Though extremely close and the facts and circumstances do not indicate such over-reaching as in Bennett v. Deaton, 57 Idaho 752, 68 P.2d 895, nevertheless, this court by the opinion in that case is committed to the doctrine that the setting aside of a release as herein, on substantial though conflicting evidence, is a question of fact for the jury or the trier of fact. Adherence to that doctrine justifies the affirmance of the judgment herein, which is accordingly so ordered." 62 Idaho 95, 109 P.2d 636.

Here the appellant knew that he suffered pain in the back following the accident. His doctor testified that wherever there is pain in the lower back the question of disc involvement is always considered. Appellant previously had suffered from back injuries. He was advised that this was a final settlement of all questions; the consideration paid for the release was more than merely nominal, and included all claimed property loss, all medical expenses incurred for appellant and his wife, also a sum for loss of wages and an additional sum for appellant's general damages, in the amount asked for by appellant. This release was executed only after appellant had been released by his doctor. Under the record, it is my conclusion that the record fully sustained the findings of the trial court, and the conclusion of law based on these findings was correct.

The judgment should be affirmed.